STATE OF MAINE                                         SUPERIOR COURT

Cumberland, ss.                                              Civil Action

FRIENDS OF MITCHELL FIELD    )
                             )
            Plaintiff        )
                             )
      v.                     )         Docket No. PORSC-CV-18-0334
                             )
TOWN OF HARPSWELL            )
                             )         STATE OF MAINE
            Defendant        )         Cumberland, ss. Clerk's Office
                             )
                                       SEP 05 2018
                                       1:15 pm
                                       RECEIVED

**DECISION AND JUDGMENT**

This case is about a municipal water tower that has become a lightning rod of contention in the Town of Harpswell after five years of discussion and study about its future.   One viewpoint is that the tower represents the best prospect for improved cellular telephone reception in many parts of the Town, and that it can repaired, repurposed and maintained at a reasonable cost at little or no expense to the Town The other viewpoint is that it is an unsafe structure, that it is beyond repair at a reasonable cost, that it is not optimal for cellular telephone purposes, and it that should be demolished.

At a Town meeting in March 2018, the proponents of demolition prevailed in a vote and the tower is scheduled to come down in a couple of weeks.  This case reflects an effort by proponents of saving the tower to stop the demolition and get another Town vote on the future of the tower.

1

The case came before the court for an evidentiary hearing August 28, 2018. Plaintiff Friends of Mitchell Field and Defendant Town of Harpswell both participated with counsel and presented evidence through witness testimony and exhibits. The hearing was electronically recorded.

Prior to the hearing, the parties filed a written stipulation of facts, which is reproduced below in the paragraphs numbered 1 through 95. In addition, the parties stipulated to the admission of 73 exhibits.[1] Additional exhibits were admitted during the hearing.

The August 28, 2018 hearing was initially scheduled for purposes of Plaintiff Friends of Mitchell Field's Motion for Preliminary Injunction, but, as set forth below, the parties stipulated to consolidate hearing on the Motion with a hearing on the merits "provided that both parties are able to get substantially all of their evidence in at the hearing." *See Stipulations of Fact* ¶ 1, *infra*. At oral argument, both parties confirmed that they were able to complete their presentation of evidence and rested at the close of the hearing. Accordingly, this Decision represents a final, appealable judgment in this case.

Oral argument was held August 31, 2018, at which point the court took the case under advisement. Based on the entire record, the court makes the following findings of fact and adopts the analysis and conclusions of law set forth below.

---

1. Exhibits 8, 9, 10, 11 and 12 were incorrectly labeled and located in the court's exhibit book. The exhibit numbers on those exhibits have been corrected to be consistent with the above index, and the exhibits have been placed behind the correct number tabs in the court's book.

2

*Stipulated Facts*

The parties stipulated to the facts set forth in the following paragraphs 1 through 95, without stipulating to any particular fact's relevance or significance:

1. The parties agree to consolidate the hearing on Plaintiff's Motion for Preliminary Injunction with a hearing on the merits of the Verified Complaint pursuant to M.R. Civ. P. 65(b)(92), provided that both parties are able to get substantially all of their evidence in at the hearing.

2. Mitchell Field is a 118.5-acre former U.S. Navy site in the Town of Harpswell ("Town") that has been owned by the Town since 2001.

3. Mitchell Field is the site of some old buildings and other site improvements built by the U.S. Navy when it owned the site, including a water tower constructed by the U.S. Navy around 1950 that is no longer in use.

4. The Mitchell Field water tower is located on one of the highest points of land in South Harpswell.

5. Cell phone coverage is limited or not available in the South Harpswell, Orr's Island and Bailey Island sections of Town and is spotty in other parts of Town, including areas near the Mitchell Field Water Tower.

6. The Town of Harpswell follows a town meeting form of government. It is governed by a three-member Board of Selectmen ("Board"). Its legislative body is the town meeting.

3

7. Richard Daniel has been the Chair of the Board continuously since March 27, 2014. Kevin Johnson has been a Board member since March 15, 2014. David Chipman was elected to the Board on March 11, 2017.

8. FMF was incorporated as a non-profit entity on February 23, 2018. FMF has no members and 3 to 9 directors. Exhibit 45 (Articles of Incorporation).

9. At the March 9, 2013 Annual Town Meeting, the voters defeated Article 38. Exhibit 2 (March 2013 Annual Town Meeting Warrant and Results).

10. On July 1, 2014, Utility Service Group ("USG") performed a Condition Assessment on the water tower for the Town and submitted a Report. Exhibit 3 (USG Report).

11. September 6, 2014 email sent from Scott Kelley of USG to the Town Administrator. Exhibit 4 (email).

12. September 19, 2014 email sent by the Town Administrator to Scott Kelley of USG. Exhibit 5 (email).

13. September 22, 2014 email sent by Scott Kelley of USG to the Town Administrator. Exhibit 6 (email).

14. At its January 14, 2016 meeting, the Board initially proposed putting an article on the 2016 Town Meeting Warrant to spend $22,000 to demolish the water tower. Exhibit 8 (Board Meeting Minutes).

15. At the January 28, 2016 Board meeting, David Chipman (who was not on the Board at the time) asked the Board to add an article to the 2016 Town Meeting

4

Warrant to keep the tower. He was advised to present a proposed article. See Exhibit 9 (Board Meeting Minutes).

16. On or about February 22, 2016, a citizen's petition with 323 valid signatures was presented to Town Clerk Rosalind Knight to add an article to the 2016 Town Meeting Warrant. Exhibit 11 (Letter from Town Clerk to Board dated February 22, 2016).

17. On February 23, 2016, Preferred Tank & Tower of Henderson, Kentucky provided the Town Treasurer, Marguerite Kelly, with a $75,000 quote to dismantle the water tower. Exhibit 10 (Letter from Preferred Tank & Tower to Marguerite Kelly dated February 23, 2016).

18. In its February 23, 2016 letter, Preferred Tank & Tower also provided the Town with a quote to repair and renovate the water tower. See Exhibit 10 (Letter from Preferred Tank & Tower to Marguerite Kelly dated February 23, 2016).

19. On March 1, 2016, Preferred Tank & Tower provided the Town with a quote to repair and renovate the water tower based on full encapsulation. See Exhibit 12 (Quote from Preferred Tank & Tower to Marguerite Kelly dated March 1, 2016).

20. On or about March 2, 2016, a meeting was held at the Town office with Board Chair Rick Daniel, Town Administrator Kristi Eiane, David Chipman, and Dorothy Rosenberg to discuss revision of articles dealing with the water tower for 2016 Town Meeting Warrant. As a result, in addition to the citizen's petition article, which remained on the warrant as Article 35, the Board of Selectmen placed Article 34 on the warrant. Exhibit 14 (2016 Annual Town Meeting Warrant and Results).

5

21. March 12, 2016: The 2016 Town Meeting approved Article 34, and Article 35 was passed over. Exhibit 14 (2016 Annual Town Meeting Warrant and Results).

22. On March 31, 2016, the Board voted to create a Water Tower Task Force ("WTTF") and adopted a specific charge for the WTTF's work. ("WTTF Charge"). Exhibit 15 (Board Meeting Minutes); Exhibit 16 (WTTF Charge).

23. On March 31, 2016, the Board appointed a WTTF Chair and four other members to the WTTF. Exhibit 15 (Board Meeting Minutes).

24. The Chair of the WTTF was Board member Elinor Multer. The following individuals were also appointed to the WTTF: Jim Knight, Nelson Barter, David Chipman, and Dorothy Rosenberg. The Board also appointed two alternate members of the WTTF: David Mercier and Donnette Goodenow. Exhibit 15 (Board Meeting Minutes).

25. The WTTF held its first meeting on April 26, 2016. Exhibit 17 (WTTF Meeting Minutes).

26. Steve Cox, Director of Engineering and Maine Water Company, attended the May 17, 2016 WTTF meeting to provide information regarding the water tower. Exhibit 18 (WTTF Meeting Minutes).

27. At a WTTF meeting held on September 6, 2016, David Libby, owner of Communication Facilities, Inc. ("CFI"), made an informal presentation to the WTTF on the possible use of the Mitchell Field water tower as a communications facility. Exhibit 20 (WTTF Meeting Minutes).

28. On October 14, 2016, Town Planner Mark Eyerman prepared a Communication Facilities Memo ("2016 CF Memo") and presented it to the WTTF at their October 18, 2016 meeting. Exhibit 21 (Communications Facilities Memo, dated October 14, 2016); Exhibit 22 (WTTF Meeting Minutes).

29. At its October 18, 2016 meeting and after discussion of the 2016 Communications Facilities Memo, the WTTF voted to issue an RFP for a water tower communications site manager. Exhibit 22 (WTTF Meeting Minutes).

30. At the October 18, 2016 WTTF meeting, the Task Force voted to recommend to the Board that the Town contract with engineering firm Woodard and Curran to, among other things, "assess the condition of the water tower to determine if anything needs to be done on an interim basis to stabilize the tower for 3 to 5 years while potential use of the tower as a communications facility is investigated further." Exhibit 16 (WTTF Meeting Minutes).

31. On or about November 7, 2016, the Town issued an RFP to solicit proposals for a water tower communications site manager ("2016 Town RFP"). Exhibit 24 (2016 Town RFP).

32. On November 28, 2016, Northern Pride Communications, Inc. ("NPCI") submitted its proposal for Water Tower Communications Site Manager in response to the 2016 Town RFP. Exhibit 25 (NPCI response).

33. On November 25, 2016, CFI submitted its proposal for Water Tower Communications Site Manager in response to the 2016 Town RFP. Exhibit 26 (CFI response).

34. At its December 6, 2016 meeting, the WTTF discussed scheduling interviews for water tower communications site managers and reviewed a preliminary list of questions to be asked of the two firms and reviewed a preliminary draft of the Woodard & Curran report on cost comparison of options for water provision on Mitchell Field. All Task Force members were given the opportunity to craft questions for these interviews. See Exhibit 27 (WTTF Meeting Minutes).

35. March 2017: Woodard & Curran prepared a Mitchell Field Water Tower Assessment report for the Town. Exhibit 29 (Woodard & Curran Report).

36. March 11, 2017: The 2017 Town Meeting approved Article 35A. Exhibit 30 (Annual Town Meeting Warrant and Results).

37. The 2017 Town Meeting elected David Chipman to be on the Board to replace retiring Elinor Multer. Exhibit 30 (Annual Town Meeting Warrant and Results).

38. The Board appointed Board Chairman Richard Daniel to replace Elinor Multer as the Chairman of the WTTF on March 15, 2017. Exhibit 31 (Board Meeting Minutes).

39. At the March 29, 2017 WTTF meeting, the WTTF reviewed Woodard & Curran's final report. Exhibit 33 (WTTF Meeting Minutes).

40. The water tower communication site manager interviews were scheduled by Town Treasurer Marguerite Kelly. Exhibit 34 (Email exchange between Marguerite Kelly and Dorothy Rosenberg dated March 30-31, 2017).

8

41. Interviews with CFI and NPCI applicants for the water tower communications site manager were conducted on April 7, 2017. The interview committee consisted of the WTTF Chair Richard Daniel, Town Administrator Kristi Eiane, Town Treasurer Marguerite Kelly and Town Planner Mark Eyerman. Exhibit 27 (WTTF Meeting Minutes of Dec. 6, 2016); Exhibit 40 (WTTF Meeting Minutes of April 18, 2017). David Chipman was present for a portion of the interviews.

42. On April 13, 2017, the Board appointed Ned Simmons to replace David Mercier as an alternate member of the WTTF. Exhibit 36 (Board Meeting Minutes).

43. At a WTTF meeting on April 18, 2017, Town Treasurer Marguerite Kelly and Town Planner Mark Eyerman reported on the interviews with communications facility site managers. See Exhibit 37 (WTTF Meeting Minutes).

44. On or about April 10, 2017, NPCI revised its proposal by email. Exhibit 35 (Email to Marguerite Kelly).

45. On or about April 10, 2017, CFI withdrew its proposal after re-considering the site, the recent engineering reports and potential carrier concerns. Exhibit 35 (Email to Marguerite Kelly).

46. The $10,000 approved in Article 35A at the 2017 Town Meeting was never expended by the Town.

47. At the WTTF meeting held on May 23, 2017, Marguerite Kelly presented the Task Force with a spreadsheet she had prepared laying out the various cost estimates for the rehabilitation of the water tower. The Task Force agreed to

9

postpone making any recommendations until additional information could be gathered. Exhibit 38 (WTTF Meeting Minutes, including attached spreadsheet).

48. At the September 12, 2017 meeting of the WTTF, Task Force member David Chipman reported that he was "moving forward with the formation of a non-profit organization to raise money for renovation of the water tower. Exhibit 39 (WTTF Meeting Minutes).

49. The WTTF held its last substantive meeting on October 20, 2017. At the request of Task Force Chair Richard Daniel, recommendations discussed by the Task Force were drafted by Town Planner Mark Eyerman and read aloud at the meeting. Exhibit 40 (WTTF Meeting Minutes).

50. At its last meeting held on October 20, 2017, the WTTF voted 5-0 to place two articles on the warrant for March 2018 town meeting: one to seek proposals from entities to rehabilitate and manage the water tower, and the other to move forward with the demolition of the water tower and raise and appropriate not more than $40,000 for that purpose if the first article did not pass. Exhibit 40 (WTTF Meeting Minutes).

51. Town Planner Mark Eyerman made a brief presentation to the Board at its December 14, 2017 meeting summarizing the WTTF recommendation of placing two articles on the warrant for the March 2018 Town Meeting. See Exhibit 41 (Board Meeting Minutes).

52. On January 23, 2018, the Board held a workshop with three members of the WTTF (Jim Knight, Dorothy Rosenberg and Ned Simmons)-, to refine the details

10

of a draft of the Request for Expressions of Interest to maintain and manage the water tower for future Town uses. Robert McIntyre attended as an observer.

53. On January 25, 2018, the WTTF held its last meeting to approve the minutes of the October 20, 2017 meeting. On that same day, the Board voted 2-0 to dissolve the WTTF (Daniel and Chipman participating). Exhibit 42 (Board Meeting Minutes).

54. On January 25, 2018, the Board issued a public Request for Expressions of Interest and/or Proposals to Lease the Water Tower ("2018 Town RFP") revised to incorporate suggestions from the January 23, 2018 workshop meeting. Exhibit 43 (2018 Town RFP).

55. On February 8, 2018, the Board placed Articles 29 and 30 on the 2018 Town Meeting Warrant as recommended by the WTTF. Exhibit 44 (Annual Town Meeting Warrant and Results); Exhibit 54 (Board Meeting Minutes).

56. Lincoln/Haney Engineering Associates, Inc. prepared a report on the water tower for FMF dated February 23, 2018. Exhibit 46 (Lincoln/Haney Report).

57. On February 26, 2018 FMF submitted multiple copies the February 26, 2018 Expression of Interest ("FMF Original Proposal") to the Town in response to the 2018 Town RFP. See Exhibit 47 (FMF Original Proposal).

58. The FMF Original Proposal was the only response to the 2018 Town RFP received by the Town.

59. The Board held a public workshop on Tuesday, March 6, 2018. The primary purpose of the workshop was for the Board and others to gain a better

understanding of the proposal submitted by FMF in response to the 2018 Town RFP. The Town invited FMF representatives to attend to discuss and answer questions about the FMF Proposal. The Town also invited the Mitchell Field Committee to send a representative to the workshop. Exhibit 49 (Email from Kristi Eiane to Board members and Town staff, dated March 2, 2018). Robert McIntyre and John Ott attended the workshop on behalf of FMF.

60. The Board's March 6, 2018 workshop was open to the public and noticed to the public in advance of the workshop. Exhibit 49 (Email from Kristi Eiane to Board, dated March 2, 2018).

61. Immediately following the conclusion of the March 6th Board workshop, Robert McIntyre approached Town Administrator and asked her if FMF could bring a document to the Town Meeting for review by voters. Exhibit 50 ("The March 6 FMF Document"). Ms. Eiane told Mr. McIntyre that she would check into it and let FMF know if the document could be distributed.

62. Town Administrator Kristi Eiane placed a phone call to the McIntyre/Rosenberg residence on Friday, March 9, 2018 and spoke to Dorothy Rosenberg, confirming that the March 6 FMF Document could be distributed at the Town Meeting.

63. On Wednesday, March 7, 2018, Robert McIntyre, came into the town office, accompanied by Hope Hilton, and gave Ms. Eiane a thumb drive and asked that the FMF Proposal, which FMF had revised slightly following the Board workshop, be posted on the Town's website. The thumb drive contained a Word version of the

12

revised FMF Proposal, entitled "Expressiions [sic] of Interest By Friends of Mitchell Field 26 February 2018." ("Corrected FMF Proposal") which was posted by town staff on the town website that day. Exhibit 51 (Corrected FMF Proposal). This document was removed from the town website after the March 10, 2018 Town Meeting.

64. At the March 10, 2018 Town Meeting, FMF was not allowed to place written materials on the table near the door where voters entered on which official Town documents are distributed.

65. Town staff directed FMF to place its written materials at a different table at the Town meeting.

66. At the March 10, 2018 Town Meeting, the Moderator read Articles 29 and 30 aloud to the meeting. After each Article was moved and seconded, the Moderator opened the floor to discussion of both Articles at the same time. Exhibit 52 (Transcript 2018 Town Meeting Discussion).

67. The Moderator presided over an open floor debate and discussion of Articles 29 and 30 which continued for approximately one hour and 10 minutes. Exhibit 52 (Transcript 2018 Town Meeting Discussion). The Moderator limited no one who wished to speak during the discussion of the two articles.

68. During the discussion of Articles 29 and 30 at the 2018 Town Meeting, Robert McIntyre pointed out to the Town Meeting that written material describing who FMF is was available on the different table at the Town Meeting. Mr. McIntyre asked the moderator if he could "simply read that one page and then sit down." After

13

the moderator gave him permission to do so, he read a prepared statement aloud. Exhibit 52 (Transcript 2018 Town Meeting Discussion).

69. The March 10, 2018 Town Meeting rejected Article 29 and approved Article 30, which authorized demolition of the water tower. Exhibit 52 (Transcript 2018 Town Meeting Discussion); Exhibit 53 (Annual Town Meeting Warrant and Results).

70. In April 2018, the Town had Katahdin Analytical Services perform additional lead testing of the water tower lower legs and surrounding soil to provide a baseline prior to demolition of the water tower. Exhibit 54 (Katahdin Analytical Services report).

71. At a Board meeting held on April 19, 2018, Dorothy Rosenberg informed the Board that a citizens' petition was being circulated to overturn the March 10, 2018 Town Meeting vote. See Exhibit 55 (Board Meeting Minutes).

72. On or about April 20, 2018, the Town issued a Request for Proposals to Demolish the Water Tower at Mitchell Field (the "Demolition RFP"). Exhibit 56 (Demolition RFP).

73. On April 23, 2018, Dorothy Rosenberg sent an email to the Board, Town Planner, and Town Administrator, and on April 24, Town Administrator Kristi Eiane sent an email reply. Exhibit 57 (Email D. Rosenberg to Board, K. Eiane, and M. Eyerman with attachments); Exhibit 59 (Email K. Eiane to D. Rosenberg with attachments).

14

74. On April 23, 2018, Dorothy Rosenberg sent an email to the Town Administrator. Exhibit 58 (Email D. Rosenberg to K. Eiane).

75. On or about April 26, 2018, a citizens' petition signed by 351 registered voters, including FMF board members ("Citizens"), was submitted to the Town requesting a secret ballot vote to repeal the 2018 Town Meeting vote approving Article 30 and to authorize the Board to enter into an agreement with FMF to manage, maintain and repair the water tower (the "Citizens' Petition"). Exhibit 60 (Citizens' Petition).

76. In a letter dated April 30, 2018, the Town Clerk certified to the Board that the 351 valid signatures of registered voters on the Citizens' Petition exceeded the 307 signature requirement to call a Special Town Meeting. Exhibit 61 (Town Clerk letter to Board).

77. The Board rejected the Citizens' Petition after considerable discussion at its May 2, 2018 meeting. Exhibit 62 (Board Meeting Minutes).

78. At FMF's direction, Maine Environmental Laboratory on or about May 24, 2018 tested paint samples reported by Robert McIntyre to be from the water tower. Exhibit 66 (FMF Request to Board with Maine Environmental Laboratory Report).

79. At its May 9, 2018 meeting, the Board adopted written findings of fact and made a written decision supporting its rejection of the Citizens' Petition after consulting with the Town attorney. Exhibit 64 (Board Findings and Decision).

80. At the May 9, 2018 Board meeting, Robert McIntyre, on behalf of FMF, submitted a written request to the Board asking the Town Attorney to meet with FMF legal representative. Exhibit 63 (FMF Request to Board).

81. On July 26, 2018, the Board awarded the demolition contract to Iseler Demolition, Inc. from Romeo, Michigan ("Iseler"). Exhibit 73 (Iseler Contract).

82. On or about June 6, 2018, FMF board members Dorothy Rosenberg and John Ott met with Town Administrator Kristi Eiane and Town Planner Mark Eyerman and provided a copy of the May 24, 2018 Maine Environmental Laboratory report on the paint samples.

83. At the June 7, 2018 Board meeting, FMF submitted a written request to the Board for reconsideration of its May 9, 2018 finding and decision. Exhibit 66 (FMF Request to Board with Maine Environmental Laboratory Report).

84. The Board took up FMF's reconsideration request at its June 14, 2018. The Board declined to reconsider its decision. See Exhibit 68 (Board Meeting Minutes).

85. June 14, 2018: Robert McIntyre, one of the Citizens, presented a copy of the Citizen's Petition to a Notary Public.

86. On June 14, 2018, the Notary Public signed a "Warrant for a Special Town Meeting of the Town of Harpswell for a special town meeting to take place on August 11, 2018. Exhibit 67 ("June 14, 2018 Warrant").

16

87. At the June 14, 2018 Board meeting, Dorothy Rosenberg presented the June 14, 2018 Warrant to the Board. Exhibit 67 ("June 14, 2018 Warrant"); Exhibit 68 (Board Meeting Minutes).

88. Following an executive session with the Town Attorney, the Board met in open session on June 28, 2018 and voted to declare the June 14, 2018 Warrant invalid and to direct the Town Clerk not to expend any funds in support of holding the special town meeting called for in the June 14, 2018 Warrant. Exhibit 68 (Board Meeting Minutes).

89. On July 13, the Notary Public signed a "Warrant for a Special Town Meeting of the Town of Harpswell" dated July 13, 2018 for a special town meeting to be held on August 10, 2018. Exhibit 71 ("July 13, 2018 Warrant").

90. On or about July 13, 2018, the Town received the July 13, 2018 Warrant".

91. At the direction of the Notary Public, FMF placed ads in the Harpswell Anchor and Brunswick Times Record for the August 10, 2018 special town meeting and a "public hearing" to discuss the secret ballot referendum question on July 28, 2018. Exhibit 72 (Published notices of July 28 hearing).

92. The Board received a letter from the Town Attorney, dated July 12, 2018, concerning the validity of the June 14, 2018 Warrant. Exhibit 70 (Letter from Attorney Tchao to Board).

93. The Board did not call a public hearing on the article contained in the July 13, 2018 Warrant.

17

94. No notice of the July 28, 2018 public hearing provided the language of the article to be voted on by secret ballot.

95. On July 26, 2018, FMF cancelled its August 10th Special Town Meeting. FMF also cancelled its July 28, 2018 Public Hearing and instead held a public informational meeting to discuss the water tower on that same date.

*The Court's Additional Findings of Fact*

This section sets forth the additional findings made by the court based on the entire record:

96. The Town of Harpswell acquired Mitchell Field, including the water tower at issue in this case, from the United States Navy in 2001. *See* Stip. Ex. 1.

97. The Mitchell Field water tower was constructed in about 1950 and consists of an elevated water tank sitting on four legs, with struts or braces between the legs. The tank has a capacity of 100,000 gallons. The tank is 28 feet across and the tower is 104 feet high. Stip. Ex. 3, at 2.

98. Although the evidence is unclear as to when the water tower ceased being used to store water, the tank has been empty for many years.

99. As indicated in paragraph 5 above, cellular telephone coverage is limited, spotty or unavailable in many parts of Harpswell. Plaintiff Friends of Mitchell Field seek to preserve the Mitchell Field water tower largely, if not primarily, because they view the top of the tower as the highest and best-suited location in the area for installation of cellular telephone equipment that could significantly improve reception.

18

100. There is an actively used private air field near Mitchell Field, and the Friends are concerned that Federal Aviation Administration standards would limit or prohibit the erection of an adequate cellular communications tower in the vicinity. However, there is no evidence that an adequate cellular communications tower could not be constructed in parts of Harpswell farther from the air field.

101. The members and directors of Plaintiff include registered voters in the Town of Harpswell, a point relevant to Plaintiff's standing, as discussed further below.

102. Article 38 on the warrant for the 2013 annual Town meeting proposed the demolition of the Mitchell Field water tower. The defeat of that article indicated that a majority of those voting wanted to explore alternatives to demolition.

103. In response, the Town retained Utility Service Group (USG) to evaluate the condition of the water tower. USG's July 2014 report (Stip. Ex. 3). That report presented a detailed assessment of the water tower's condition, and concluded that "[o]verall the tank is in good sanitary and structural condition . . . [and] [t]here are no significant deficiencies that could not be rectified if the tank were to be returned to active service." Stip. Ex. 3. The report identified a substantial number of repairs that would be needed to restore the tank, but contained no estimates of cost.

104. Also, the report presented the results of a laboratory analysis of three samples taken the tower to be tested for lead and chromium. *See* Stip. Ex. 3 (Eastern Analytical laboratory report). Two of the samples tested at low levels of lead (180 and 690 mg/kg) but the third sample—taken from the exterior shell of the tank—tested well above the safety limit for lead (47,000 mg/kg). *Id.*

19

105.    The 47,000 mg/kg test was so high as to indicate that a repair of the tank could require sealing or encapsulation of the exterior of the tank.   On the other hand, the result was so much higher than the other lead test results as to raise the question whether it was an outlier or aberration.

106.    In a follow-up email to Town representatives on September 6, 2014, Scott Kelley of USG provided the Town with estimates of the cost to "bring your tank up to best level of service as a water storage tank." Stip. Ex. 4.  The total estimated cost was $332,500.

107.    In the same e-mail message, Mr. Kelley issued a strong safety warning. He wrote that allowing the water tower to remain standing without water in the tank was "extremely risky," and recommended "that action be taken immediately.  Severe weather may lead to failure of the structure." *Id.*   In a later e-mail to the Town administrator, Mr. Kelley elaborated on his warning by writing, "This steel structure was designed to have water in it.  Without water it is a liability.  With severe weather, the structure may fall over without the designed weight of having water in it." Stip. Ex. 6.

108.    The three quotes that the Town later obtained from Preferred Tank & Tower (Stip. Ex. 10, 12) were to help the Town understand what costs were associated with demolishing and repairing the water tower.    Preferred Tank quoted the following costs:

$75,000 to demolish the water tower

$138,625 to repair it without sealing or encapsulating exterior surfaces

$337,125 to seal/encapsulate all exterior surfaces, to eliminate any risk from high lead levels in the exterior coating

109. The Town's March 2016 annual meeting warrant included two articles relating to the water tower. They were similar in wording. Article 34 was sponsored by the Select Board and it would create a reserve fund of $22,000 to be used to fund further analyses of the Town's options for the water tower. Article 35 resulted from a voter petition and it would have committed the Town to spend $22,000 on repairing and maintaining the tower. Article 34 was adopted by the voters and Article 35 was passed over. *See* paragraph 21, *supra*.

110. As a result of the Town meeting vote, the Select Board at its March 31, 2016 meeting created the Water Tower Task Force (WTTF). The WTTF was structured to include four Town residents as primary members, two more as alternates, and a Select Board member to serve as chair. The Select Board decided to appoint residents with differing viewpoints to the WTTF.

111. The WTTF met regularly during the middle months of 2016, gathering information from people with expertise in the fields of public water supply, cellular communications and cell tower construction and leasing. *See* Stip. Exs. 17-20 (WTTF meeting minutes).

112. At its October 2016 meeting, the WTTF voted to ask the Town to issue an RFP for a water tower site communications manager, and to ask the Town to contract with the Woodard and Curran consulting engineers to focus on water supply issues relating to the existing well and water tower. *See* Stip. Ex. 22. At the same

21

meeting, there was discussion about the availability of funding for the repair and maintenance of the tower from private sources, but it was agreed that no commitments should be made based on private funds without assurance that the funds would be available when needed. *See id.*

113. The Town Select Board granted both requests, issuing the RFP in November and delegating to the WTTF the responsibility for evaluating proposals submitted in response to the RFP. *See* Stip. Ex. 24. The Town also contracted with the Woodard and Curran firm as the WTTF had recommended.

114. At the Town's annual meeting March 11, 2017, the voters adopted Article 35A on the warrant, authorizing $10,000 in Town funds to be spent on determining "the feasibility of placing wireless communications equipment on the Mitchell Field Water Tower by obtaining information that includes the number of interested carriers, what potential payments the Town may derive from equipment placement, and a detailed description of the work required and associated costs to place the Tower in service as a communications site." Stip. Ex. 30 at 14.

115. Presumably the goal was for the Town to retain a water tower site communications manager who, working with the WTTF, would compile the information described in Article 35A. Things did not work out that way.

116. The WTTF designated an interview committee to meet with NPCI and CFI, the two companies that submitted proposals in response to the RFP. Due to member unavailability, however, the group that actually met with NPCI and CFI was limited to Town staff and the chair of the Select Board.

22

117. After meeting with the interview committee, CFI withdrew its proposal and NPCI revised its proposal. *See* Stip. Ex. 35. The email messages sent by CFI and NPCI indicated that they were backing away because they had realized that the Town anticipated that the costs of repairing and maintaining the tower would be covered by the income from leasing the tower to cellular communications providers. Neither CFI nor NPCI considered that expectation to be a reasonable one. In fact, CFI's email message flatly indicated that the tower was not a viable option for placement of cellular communications equipment and "a new and separate freestanding tower is the only viable option for the property." *Id.*

118. It appears that the interview committee led CFI and NPCI to think the cost of repairing and maintaining the water tower would have to be covered by income from leasing the tower for placement of cellular communications equipment, even though no such decision had been made by the Town.

119. The interview committee presumably did not set out to scare away the two companies that responded, but that is what the Friends of Mitchell Field appear to claim happened. On the other hand, the Friends' claims of bias on the part of the Town are largely refuted by the fact that, over a period of years, the Town, through the voters at annual meeting and the Selectmen, readily agreed to many of the steps that those who favored keeping the water tower had asked. Moreover, the Town staff continued to investigate options for using the water tower for purposes of cellular communications. *See* Stip. Ex. 40 (memoranda attached to minutes of WTTF meeting October 20, 2017).

23

120. By the fall of 2017, it had become obvious that the WTTF process was not going to generate a consensus report and recommendation on the future of the water tower. The members of the WTTF were themselves divided, with two regular members in favor of keeping the tower and the other two in favor of demolishing it.

121. The WTTF's mandate required the WTTF to issue a report and recommendations at the end of its work, and the WTTF's report recommending that two competing articles to be placed on the Town meeting warrant was likely as close the only consensus report and recommendation the WTTF could have reached. *See* Stip. Ex. 40.

122. The Select Board followed the WTTF's recommendation and also began to set in motion processes to enable either alternative to be implemented. To enable the "keep" article to be implemented should the voters favor it, the Select Board issued a Request for Expressions of Interest and/or Proposals in January 2018, specifically to enable outside groups within the community to submit proposals to lease and maintain the water tower.

123. In response, some of the Harpswell residents who favored keeping the water tower, including at least one member of the WTTF, formed the Plaintiff Friends of Mitchell Field as a Maine nonprofit corporation in February 2018. *See* Stip. Ex. 45. The Friends submitted their proposal to the Town February 26, 2018. Stip. Ex. 47. The proposal included an assessment of the condition of the water tower performed at Plaintiff's request by a structural engineer. Stip. Ex. 46. The assessment concluded

that "the effort to stabilize the condition of the water tower amounts to little more than addressing some deferred maintenance issues." *Id.* at 2.

124. At the March 1, 2018 Select Board meeting, the Town administrator informed the Board of the Friends' proposal and raised a couple of questions about the insurance and financial components of the proposal. *See* Stip. Ex. 48. The Board discussed the proposal at a workshop March 6. One question raised at the workshop was whether the Friends' response that several of the Town's requirements were "Not a Problem" meant that the requirements were agreed to.

125. The Friends decided to clarify their proposal by replacing the "Not a Problem" phrase with the word "Agreed," and delivered a revised version of the proposal to the Town on March 7, 2018. The Town posted the Friends' proposal on its website later that day.

126. Meanwhile, representatives of the Friends were in touch with the Town administrator regarding the March 10, 2018 annual Town meeting. A Friends representative, Robert McIntyre, asked the Town administrator whether the Friends could hand out copies of their proposal at the meeting. At the August 28, 2018 court hearing, Mr. McIntyre testified that the Town administrator told him that the proposal could not be distributed at Town meeting because it related to an article on the Town meeting warrant. Whether this was in fact what was said is not clear, because it is agreed that the Town administrator also said that the Friends could bring a summary of their proposal to the meeting—which would also have related to an article—if the summary were reviewed in advance with the Town's attorney. It would

25

make little sense for the proposal to be barred but a summary of it to be allowed. In any event, the Town administrator later denied telling the Friends their proposal could not be brought to Town meeting. *See* Stip. Ex. 62, at 8.[2]

127. The Friends prepared a summary of their proposal and it was reviewed by the Town's attorney as requested by the Town. *See* Stip. Ex. 50. However, the Friends were told they could not hand out copies during the meeting, and instead should leave copies on the table set aside for groups in the community to place materials for Town meeting participants to pick up.

128. During the Town meeting, five of the six directors of the Friends of Mitchell Field listed in the Friends' revised proposal spoke in favor of the "keep article." *See* Stip. Ex. 52 at 6, 8-9, 10-11, 13-16, 20-21, 21-22. During his remarks on behalf of the Friends, Mr. McIntyre directed the voters' attention to the Plaintiff's materials. *Id.* at 11. Other speakers advocated for the "remove" article. There is no indication that anyone was precluded from speaking until debate on the two articles was closed.

129. After debate was closed, the vote at Town meeting was not to approve the "keep" article, Article 29 but to approve the "remove" article, Article 30. *See* Stip. Ex. 53, at 15 (annual Town meeting results).

---

[2] A possible explanation for what seems to be a misunderstanding is that the Town administrator said that the Friends could not hand out their proposal at the meeting, and the Friends interpreted her statement to mean they could not bring the proposal to the meeting at all.

26

130.    At some point around this time, the Town decided to commission further testing of lead levels on and around the tower, along with testing for asbestos.   It appears that the primary purpose of the testing was in connection with the Town's development of a request for proposals for the demolition of the tower.   The only testing for lead done to date had been in connection with USG's July 2014 report.

131.    In April 2018, the Town received the results of the additional laboratory tests it had commissioned.    *See* Stip. Ex. 54.    The test results indicated that four samples—two of paint chips and two of soil taken from under or around the tower— had lead levels well below the health safety limits for lead, and the 47,000 mg/kg level reflected in the 2014 USG report. *Id.*

132.    At the Select Board's April 19, 2018 meeting, the Board reviewed and approved a request for proposals to demolish the Tower.  Stip. Ex. 55, at 2. Also, the Town administrator informed the Board of the new test results, which indicated that the soil around the tower was within acceptable limits for lead and would not need to be excavated as part of the demolition project. *Id.*

133.    The Town's RFP for demolishing the water tower was issued April 20, 2018. *See* Stip. Ex. 56.

134.    At the April 19 Select Board meeting, representatives of the Friends advised the Board that a petition for the Board to revisit and undo the Town meeting vote, based on new information, was in the works and would be submitted to the Board. *Id.*

135. After the Select Board's April 19, 2018 meeting, representatives of the Friends and the Town engaged in a dialogue about the significance of the new lead test results. *See* Stip. Exs. 57-59.

136. For the Friends, the new lead test results confirmed that the 47,000 mg/kg test result obtained by USG in 2014 was not valid, in light of the fact that all six of the other samples in the 2014 and 2018 tests had tested at lead levels well below federal and state standards. The Friends were convinced that the "keep" or "remove" issue had to be revisited because the Town's March 10, 2018 vote was based on incomplete and misleading information. *See* Stip. Exs. 57, 58.

137. Following the April 19, 2018 Select Board meeting, Dorothy Rosenberg, sent an email message to Town officials and staff pointing out that the new lead test results showed that the "least expensive justification for demolition of the water tower collapses. Without lead contamination, the water tower turns out to be the least expensive option for providing cell phone service to the Neck, Bailey and Orr's Islands." Stip. Ex. 57. The email said that the WTTF report contained "errors of such magnitude as to invalidate its core conclusions," with the result that the Select Board had presented "incorrect and misleading information to the citizens of Harpswell prior to the vote at Town meeting." The email called on the Select Board to apologize to the citizens and correct the mistake. *Id.*

138. The Town Administrator responded in an April 24, 2018 email that included a memorandum from the Town planner discussing the previous and new lead test results. Stip. Ex. 59. The Town's view of the new lead test results was that the

28

disparity between the 47,000 mg/kg lead test result obtained by USG and the far lower results in the other six samples tested simply reflected the presence of different lead levels on different parts of the tower structure. *See id.*

139. On April 26, 2018, the Friends of Mitchell Field and other supporters of keeping the water tower submitted petitions for the Select Board to convene a secret ballot vote on whether to "repeal the decision of the Harpswell Town Meeting on March 10, 2018 on Warrant Item #30 and authorize the Select Board to enter into an agreement with the non-profit corporation Friends of Mitchell Field . . ." to repair, manage and maintain the water tower. Stip. Ex. 60.

140. The wording of the petition was somewhat different than the wording of Article 29, the "keep" article that the voters rejected at the March Town meeting. Article 29. Article 29 asked the voters to decide whether to authorize the Town to enter into an agreement for up to 20 years (and possible further extensions) with an unspecified for-profit, non-profit or other entity. *See* Stip. Ex. 53. The question advanced in the petition was whether the Town should enter into an agreement with the Friends of Mitchell Field for five years. *See* Stip. Ex. 60.

141. The Town Clerk determined that the petition included 351 valid voter signatures, well over the amount required for such a petition (and well over the number of voters who had participated in the March 10, 2018 Town meeting). *See* Stip. Ex. 61.

142. The Select Board took up the petition at its May 2, 2018 meeting. After a lengthy debate, the Board voted 2-1 to reject the petition. *See* Stip. Ex. 62. During

29

the discussion, the Friends told the Board that the Town administrator had refused to permit them to distribute their proposal at the Town meeting, but the Town administrator denied that she had done so. *See id.* at 8.

143. At its May 9, 2018 meeting, the Board adopted its Findings of Fact and Decision Concerning Citizens' Petition Regarding Mitchell Field Water Tower. Stip. Ex. 64.

144. At the Board's May 17, 2018 meeting, the Town administrator presented to the Board the three bids that had been submitted in response to the Town's RFP for demolition of the water tower. *See* Stip. Ex. 65, at 2.

145. The Friends and other proponents of keeping the water tower decided to pursue their concerns in two different directions. First, they submitted to a notary public the same petition they had submitted to the Board, for purposes of having the notary convene a special town meeting pursuant to 30-A M.R.S. § 2521(4). They also filed a request for reconsideration with the Select Board. *See* Stip. Ex. 66. The request was based mainly on the new lead test results the Town had obtained in April, but also on "allegations of impropriety on the part of town officials before, during and after Town meeting." *Id.* at 2.

146. The notary to whom the Friends and other proponents of keeping the water tower had presented the petition that the Select Board had rejected issued a Warrant for a Special Town Meeting on June 14, 2018. *See* Stip. Exs. 67. The Warrant called for a special Town meeting to be held at the Merriconeag Grange hall August 11, 2018. Stip. Ex. 67. It was later determined that the hall was not available

30

that day, so the notary issued an amended warrant calling for a meeting on August 10, 2018. Stip. Ex. 71.

147. On the same day, June 14, 2018, the Board held a meeting at which a lengthy debate about the request for reconsideration ensued. Stip. Ex. 68, at 2-3. Accusations of bias and conflict of interest were made by both sides in the dispute about the future of the tower. *Id.* The request for reconsideration was effectively denied because neither of the two members of the Select Board who had voted to reject the petition moved to reconsider. *Id.* at 3. The June 14, 2018 Board meeting also included further discussion of the bids for demolishing the tower. *Id.* at 3-4.

148. At the Board's June 28, 2018 meeting, based on advice from the Town attorney, the Board voted "to deem [the notary's] warrant invalid and to direct the Clerk not to expend any funds on this effort." Stip. Ex. 69, at 2. The Board also voted to enter into a contract with the low bidder in response to the RFP for the demolition of the water tower, with a contingency relieving the Town of responsibility if the demolition were enjoined. *See id.* at 2-3. The contract was executed effective July 26, 2018. *See* Stip. Ex. 73.

149. Meanwhile, the Friends placed advertisements in the Brunswick Times Record for a July 28, 2018 hearing and an August 10, 2018 Town meeting on the notary's amended warrant. *See* Stip. Ex. 72.

*Analysis and Conclusions of Law*

150. Based on the Town's rejection of the notary warrant, the court recommended that the hearing and Town meeting called by the notary not be held,

31

until the court could decide whether the petition to the notary was valid. The Friends agreed to the recommendation, on the understanding that the court retained the ability to order the Town to convene a hearing and vote on the notary's warrant.

151. The Plaintiff Friends' complaint seeks a declaratory judgment and mandatory injunction to the effect that the Town is required to convene a hearing and vote by secret ballot on the notary's warrant. The Friends also ask the court to enjoin the Town from demolishing the water tower until and unless the Town holds the vote that the Friends are seeking.

152. The Town has raised a variety of objections to the Friends' cause of action, only some of which require extended discussion. The Town questions the Friends' standing to sue. However, the court is prepared to assume, without deciding, that the Friends have standing, based on the doctrine of associational standing. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). Plainly some of the directors of the Friends actively participated in the proceedings at issue, and may have had standing had they brought this case in their own names.

153. The Town also asserts that the Friends cannot challenge the May 9, 2018 Findings of Fact and Decision Concerning Citizens' Petition Regarding Mitchell Field Water Tower under M. R. Civ. P. 80B because the complaint was not filed within the deadline set by that rule. At oral argument, the Friends did not disagree that any direct Rule 80B appeal from the Board's May 9, 2018 Findings of Fact and Decision is time-barred. However, the Friends assert instead that the question before the court is whether the petition submitted to the notary public was valid for purposes of

32

declaratory and injunctive relief in the nature of a writ of mandamus requiring the Town to convene another Town meeting and vote on the question framed in the petition. *See* 14 M.R.S. § 5301.[3]

154. The Friends contend that the Town is required to call a Town meeting and vote under the Maine statute allowing voters to petition a notary to call a town meeting when town selectmen unreasonably reject a petition of the voters. *See* 30-A M.R.S. § 2521(4), 2522. The statutes read as follows:

> **Petition for article in warrant:** On the written petition of a number of voters equal to at least 10% of the number of votes cast in the town at the last gubernatorial election, but in no case less than 10, the municipal officers shall either insert a particular article in the next warrant issued or shall within 60 days call a special town meeting for its consideration.

30-A M.R.S. § 2522.

> **Petition by voters, if selectmen refuse.** If the selectmen unreasonably refuse to call a town meeting, a notary public may call the meeting on the written petition of a number of voters equal to at least 10% of the number of votes cast in the town at the last gubernatorial election, but in no case less than 10.

30-A M.R.S. § 2521(4).

155. The Maine Law Court has interpreted both of these statutes in its decision in *Dunston v. Town of York*, 590 A.2d 526 (Me. 1991). Despite the seemingly mandatory "shall either insert . . . or call" terminology within section 2522, the court decided that the alternative petition remedy established in section 2521(4) recognizes "the authority of the selectmen to exercise their sound discretion in determining

---

[3]  The writ of mandamus has been abolished in Maine but mandatory injunctive relief in the nature of a writ of mandamus remains available. *See Dunston v. Town of York*, 590 A.2d 526, 528 (Me. 1991).

33

whether the written petition required compliance with the provisions of section 2522." *Id.* at 527.

156. At oral argument, the parties appeared to agree that the Plaintiff Friends has the burden to establish their right to relief in this case, and that the burden has two elements:

   a. To prove that the Town Select Board's refusal to call a town meeting in response to the petition submitted to the Board was unreasonable, i.e. an abuse of their discretionary authority

   b. To prove that the petition submitted to the notary public was valid.

   *See* 30-A M.R.S. § 2521(4).

157. For the reasons set forth as follows, the court concludes, based on the entire record, that the Friends have not proved either element of their burden.

158. With regard to the unreasonableness of the Select Board's refusal of the petition, the Friends assert three grounds: that the petition presented a different question than the question voted upon at Town meeting; that the petition was based on new information that should have been presented to the voters at Town meeting, and that there were improprieties before and at the Town meeting that justify a new vote.

159. Although the wording of the petition was somewhat different than the wording of article 29 on the Town meeting warrant, *compare* Stip. Exs. 53 and 60, the Select Board could reasonably have decided at their May 9, 2018 meeting that the

34

petition was asking for a revote on the essentially the same question that had been decided at the Town meeting—should the water tower be demolished or not?

160.   The petition identified the Friends specifically as the entity with which the Town would have an agreement whereas Article 29 did not. Still, the Select Board could reasonably have decided that the voters were aware at the Town meeting that the Friends were hoping to be the entity that contracted with the Town to repair and maintain the water tower.

161.   Maine law does not compel either a municipal board or a school board to schedule a revote upon petition by voters on an issue that has already been acted on by the electorate. *See Heald v. School Administrative District No. 74*, 387 A.2d 1, 4 (Me. 1978); *Town of Vassalboro v. Denico*, 1990 Me. Super. LEXIS 51.   Under the *Dunston* standard, the Harpswell Select Board's view that the fundamental question raised in the petition had already been decided by the voters was a reasonable one.

162.   As to the contention based on new lead test information, the Select Board could reasonably have decided that the new lead test results were not the "game changer" for voters that the Friends thought they were.   The Town meeting vote to demolish the tower did not hinge on the validity of the 2014 lead test results.   Also, the new test results did not prove that the high 47,000 mg/kg result was wrong, particularly since the new results were from samples taken from other locations than the exterior of the tank, where the sample that yielded the high test was taken.

163.   As to  alleged improprieties, the Friends failed to prove anything rising to the level of an impropriety by Town officials or staff.  The Friends' allegations of

impropriety fall into three different categories. First, the allegation that the Select Board Chairs who also chaired the WTTF were biased and prevented the WTTF from meaningful exploration of the potential for saving the water tower. Second, allegations that the Town staff was "biased" in favor of demolishing the tower. Third, allegations that the Friends were prevented from bringing their proposal at the Town meeting and were required to leave their summary on a table instead of being allowed to pass it out.

164. The first chair of the WTTF was Select Board Member Elinor Multer. When she left the Select Board, the current Select Board chair, Richard Daniel, took her place as WTTF chair. Mr. Daniel testified at the August 28, 2018 hearing that he favored demolishing the water tower for safety reasons.

165. The fact that Mr. Daniel had a viewpoint on the future of the tower does not, in and of itself, prove anything. Select Board members can and should develop positions on issues affecting the Town. The question is whether Mr. Daniel imposed his viewpoint in an inappropriate manner while chairing the WTTF, and the record does not show that he did.

166. Given that the other four members of the WTTF were divided on the tower issue—two favoring saving the tower, two favoring demolishing it—Chair Daniel plainly could have imposed his personal viewpoint upon the WTTF by breaking the impasse and calling for a vote on whether to recommend demolition or not. Had he done so, the WTTF would likely have issued a report by vote of 3-2 with a specific recommendation in favor of demolition. But he did not force the issue in

36

that fashion. Instead, he voted, along with the others, to recommend the "keep" option, even though he disagreed with it, along with the "remove" option.

167. Another allegation against Chair Daniel is that he did not support all of the suggestions and recommendations made by WTTF member Dorothy Rosenberg, who is a director of the Friends. This accusation as well does not prove any impropriety—no member of any committee is entitled to have all her or his suggestions and recommendations adopted by the committee or supported by the committee chair.

168. The allegation that the Town staff was biased against saving the tower is similarly not supported in the record. The record shows that Town staff continued to support the WTTF and respond to WTTF members' requests until the WTTF ceased to function after October 2017.

169. Likewise, the allegation that there were improprieties before and during the 2018 Town meeting was not borne out in the evidence. The Friends' claim that the Town administrator forbade them from bringing their proposal to the Town meeting because it related to a Town meeting warrant article was not only denied by the Town administrator, but also makes little sense given that the Friends were admittedly allowed to place a summary of their proposal for distribution, which related to Articles 29 and 30 as much as their proposal did. The Town's requirements that the summary be reviewed by the Town attorney and that it be placed on a table of materials rather than handed out likewise were not improper. There is no evidence that the Friends were treated differently than other groups.

37

170. The Friends also appear to complain that the Town did not post their proposal on the Town website for a sufficient length of time, and did not allow them to put their summary on the table of Town materials. This argument overlooks the fact that the Town was not required to endorse or support the Friends' proposal. The Town's willingness to post the Friends' revised proposal on the Town website from March 7 to March 10, 2018 was in fact more than the Friends were entitled to.

171. For the foregoing reasons, Plaintiff Friends has not proved that the Harpswell Select Board unreasonably refused to grant their petition for purposes of 30-A M.R.S. § 2522 and 2521(4).

172. Even had the Friends met their burden of persuasion on the issue of whether the Select Board unreasonably rejected their petition for purposes of 30-A M.R.S. §§ 2521(4), their petition to the notary was defective because it was the same petition addressed to the Select Board, and not a separate petition addressed to the notary.

173. Section 2521(4) could have provided that the same petition that was presented to the selectmen can be presented to a notary if the selectmen refuse it, but it does not. Instead, section 2521(4) requires a different written petition to be submitted to the notary, and there is a good reason for that. A petition addressed to one entity for one purpose cannot simply be redirected to a different entity for a different purpose. Here, it cannot be assumed that the signers of the petition to the Select Board would necessarily support a petition addressed to a notary after the Select

38

Board had declined to act upon the petition. Some signers might accept the Select Board decision and not want to take the next step.

For all of the foregoing reasons, the court finds and concludes that the Plaintiff Friends of Mitchell Field has not proved that the Town is obligated to schedule and hold a vote on the Friends' petition.

IT IS ORDERED AND ADJUDGED AS FOLLOWS:

1. Plaintiff's prayer for declaratory relief is granted in part and otherwise denied. The court declares as follows:

(a) For purposes of 30-A M.R.S. § 2522, the Harpswell Select Board did not unreasonably refuse to call a town meeting in response to the Plaintiff Friends of Mitchell Field's petition submitted to the Board April 26, 2018,

(b) The petition submitted by Plaintiff Friends of Mitchell Field to a notary public did not comply with 30-A M.R.S. § 2521(4) and therefore was not a valid basis for convening town meeting under that section.

2. Plaintiff's prayer for injunctive relief is denied.

3. Except for the limited grant of declaratory relief in subparagraphs (a) and (b), the Defendant Town of Harpswell is granted judgment on the Plaintiff's complaint.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Decision and Judgment by reference in the docket.

Dated September 5, 2018

_____
A. M. Horton, Justice

Entered on the Docket: 9·5·18

39

*Friends of Mitchell Field vs. Town of Harpswell,* PORSC-CV-18-334

**Plaintiff's Counsel:**

Christopher Neagle, Esq.
Troubh Heisler

**Defendant's Counsel:**

Amy Tchao, Esq.
Drummond Woodsum